**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

Myles Regenold,

        Plaintiff,

v.

Tony Higgins, acting in his
individual capacity as an Ankeny
Police Officer,

        Defendant.

COMPLAINT
Jury Trial Demanded
Under FRCP 38(b)

For his Complaint, Myles Regenold ("Regenold") states and alleges as follows:

Introduction

1. This is an action for money damages for injuries sustained by Regenold after being shot in his dominant right arm without legal justification by Ankeny Police Officer Defendant Tony Higgins ("Higgins").

2. On March 19, 2019, Regenold broke into the empty Ankeny Auto Spa (the "Auto Spa"), a car wash. Higgins responded to the scene and shot Regenold while he held his empty hands up in the air in a surrender position. Regenold was never warned about the use of deadly force before Higgins shot him. Regenold was unarmed and posed no threat to Higgins or anyone else.

3. Higgins's improper use of deadly force, while acting under color of state law, violated Regenold's well-settled federal civil rights.

The parties

4. Regenold was, at all times material herein, a citizen of the United States and a resident of the State of Iowa.

1

5.  Upon information and belief, Higgins was, at all times material herein, a citizen of the United States, a resident of the State of Iowa, and a duly appointed and acting officer of the City of Ankeny Police Department.  He is sued in his individual capacity for misconduct occurring under color of state law.

## Jurisdiction and venue

6.  Regenold brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned constitutional and statutory provisions confer original jurisdiction of this Court over this matter.

7.  As this action arises purely out of federal law, state-law claims and, by consequence, any limitations and defenses available under state law are not applicable to this civil-rights lawsuit.

8.  Venue is proper in this Court under 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to this action occurred in this District.

## The shooting

9.  Audio and video of certain of the relevant events were captured on Higgins's Body-Worn Camera ("BWC") and on the Auto Spa's surveillance cameras and were provided to Regenold pre-suit – although oddly no recording captures the shooting itself.

10.  Regardless, the events in question unfolded at approximately 4:00 a.m. on March 19, 2019.

11.  Around that time, police were advised by the owner of the Auto Spa that there was a male inside the Auto Spa building.

12. Regenold had used a pry bar to open the main lobby door. The Auto Spa was closed at the time and no one else was inside. The owner had made her report based upon off-site surveillance footage.

13. Higgins responded to the call and drove to the Auto Spa.

14. Before arriving, Higgins was advised that there was one male inside the building. Regenold was that male.

15. At no point was Higgins advised that the male inside the building was armed. Audio confirms that Regenold had dropped the pry bar long before Higgins's arrival.

16. Upon arriving at the Auto Spa, Higgins parked his squad car on the north side of the building, activated his BWC, and exited his car, approaching the east bay door window of the Auto Spa.

17. Higgins later reported that as he looked inside that window, he saw a subject inside the Auto Spa wearing a dark coat/gray hoodie, moving around the lobby area of the building. He also reported that he thought the subject had seen him.

18. But, as Higgins proceeded to the west bay door window, he observed Regenold still moving around and it was clear to him that Regenold was unaware of his presence.

19. Higgins then moved to the building's east side, where the Auto Spa's main entrance and lobby were located.

20. There, Higgins discovered the glass main-entrance door had been "busted" open.

21. Higgins peered through the door into the Auto Spa's main lobby and adjacent areas.

22. The BWC recording, and the Auto Spa's own surveillance footage, shows that these areas of the building were well lit, as depicted below:

91288741.1



23. After briefly looking through the main lobby door, Higgins moved slightly to the south in a position of concealment, where he waited for other officers to arrive.

24. Higgins remained in his position of concealment for approximately 25 seconds when he radioed for back up to "pick it up" (come faster). Higgins later reported that he relayed this message in response to a loud noise inside the Auto Spa, which led him to believe the subject was about to exit the building.

25. Higgins remained in his position of concealment for approximately 20 more seconds when Ankeny Police Sergeant Nate Lampe arrived and ran up to the Auto Spa door.

26. Higgins told Lampe that the subject was still inside the building.

27. Within seconds, Lampe held open the door to the Auto Spa, and Higgins proceeded immediately inside with his gun pointed in front of him.

28. Before entering, the officers had no discussions about how they intended to search the building or any plans that would give the subject inside an opportunity for peaceful surrender.

91288741.1

29. Indeed, the officers had no discussions at all once Lampe held open the door.

30. Higgins was in the lobby of the Auto Space for approximately two seconds before observing Regenold to his right, behind a counter.

31. Higgins immediately screamed something and then fired two shots at Regenold a split second later.

32. No warnings were given to Regenold regarding potential use of force—let alone deadly force—by Higgins or anyone else prior to Higgins firing two shots at Regenold.

33. No clear commands were given to Regenold by Higgins or anyone else prior to Higgins firing two shots at Regenold.

34. In fact, Lampe said nothing from the time he opened the main lobby door through the time Higgins fired.

35. Lampe later stated that he was not in a position to see Regenold when Higgins fired two shots.

36. Regenold was in the Auto Spa's office area when he realized that someone entered the building. The office area is behind a counter and located inside the opened door in Paragraph 22 above.

37. Regenold was not aware that person was a police officer. Neither officer identified himself as law enforcement prior to Higgins shooting Regenold.

38. Regenold reacted to the presence of someone else in the Auto Spa by putting his hands up—each arm was raised and his hands were up and apart. He knew someone had caught him in the act.

39. Regenold had on winter gloves and his hands were empty when Higgins encountered him.

91288741.1

40. Regenold's empty hands were raised in the air and were apart when Higgins shot him.

41. There was no information that would have indicated to an objectively reasonable law-enforcement officer that Regenold was armed or that Regenold had something in his hand(s) when he was shot.

42. Between the time he appreciated the fact that someone else was in the building and the shooting, Regenold only had time to do exactly what he did: put his hands up.

43. Regenold had the following exchange with Higgins and others minutes after the shooting:

| | |
|---|---|
| 04:14:07 BWC | Unknown Officer: He had something in his hand. |
| | **Regenold: I didn't have nothing in my hand.** |
| 04:14:11 BWC | Higgins: I saw something in your hand. |
| | **Regenold: What did I drop if I had something in my hand?** |
| | Higgins: I don't know man. I don't know man. |
| | **Regenold: I didn't drop anything. I didn't have nothing.** |
| 04:14:26 BWC | Higgins: I said show me your hands you got something in your hand. |
| | **Regenold: You didn't say that…you shot me…quick on the trigger…** |

44. Below is a still photograph from Higgins's BWC the first time Regenold becomes visible on that video. It depicts Regenold laying on the ground across the doorway to what Higgins later described as the "office area":



45. As depicted in that photograph, there were no items in Regenold's hands, nor any weapons or other dangerous items on the floor around them.

46. Higgins and Lampe later claimed that a number of things occurred in the split second between Higgins shouting and discharging his weapon.

47. In that instant, Higgins claimed that he observed Regenold behind the counter in the office doorway and that he gave Regenold the command to put his hands up.

48. In that instant, Higgins claimed that Regenold did not comply with his order *and* moved his hands together as if he was preparing to "punch out" with a weapon.

49. In that instant, Higgins claimed that he saw something in Regenold's hand.

50. In that instant, Higgins claimed that Regenold advanced on him.

51. None of these things were true.

91288741.1

52. Higgins did not command Regenold to put his hands up, and Regenold did not fail to comply with any such command.

53. Regenold did not move his hands together or prepare to "punch out" with a weapon. Indeed, Regenold's hands were empty and he had no weapon in his possession when he was shot.

54. Moreover, Regenold did not "advance" on Higgins. Notably, Regenold was never charged with any crime, such as assault on a police officer, for purportedly "advancing" on Higgins.

55. Regenold was behind a counter between him and Higgins when he was shot. Even if he had "advanced," as Higgins claimed, such conduct would not have posed an immediate threat of serious bodily harm to Higgins or Lampe, two fully trained and armed police officers at the scene, such as to justify Higgins's use of deadly force.

56. Lampe, too, later claimed that Higgins gave Regenold "verbal commands" including "show me your hands, let me see your hands." The video evidence clearly contradicts that claim.

57. The gunshot entry wound is circled below. Both it and the forensic medical evidence support Regenold's account of the incident – that is, he had his arms up in a surrender position when he was shot:

91288741.1



58. Below is another photo of the entry wound and Regenold's gunshot-related surgical scar:



91288741.1

59. Regardless, even if Higgins had managed to utter clear commands to Regenold, he did not allow sufficient time for compliance.

60. Higgins was faced with a subject that had surrendered with empty hands and his hands up.

61. No objectively reasonable officer would have fired at Regenold under these circumstances.

62. Higgins's volitional decision to do so constituted the unlawful use of excessive force.

Regenold's injuries

63. After the shooting, Regenold was handcuffed behind his back.

64. Multiple officers responded to the scene and a tourniquet was placed on his right arm.

65. That tourniquet was placed <u>over</u> Regenold's coat and clothing.

66. The tourniquet did little to slow Regenold's bleeding. He was laying on the ground with his bullet-shattered right arm behind his back, next to a large pool of his own blood:

91288741.1



67.     Regenold was in immense pain from the bullet wound to his arm and the massive damage it had caused.

68.     Recognizing that he had seriously wounded Regenold, Higgins implored Regenold to keep breathing.

69.     Regenold told the officers that he did not want to die.  An officer scoffed in response, telling him, "You ain't gonna die from a gunshot through your arm."

70. Regenold's arm continued to bleed profusely. He briefly lost consciousness while on the floor as he waited for paramedics to arrive, with officers repeatedly yelling out his name but receiving no response. He eventually he came to, still bleeding and handcuffed.

71. Paramedics later arrived and made their way to Regenold. His wound was still bleeding.

72. A paramedic wanted to get Regenold's coat off and his handcuffs were removed to accomplish that.

73. Regenold was then transported by ambulance to Mercy Medical Center Des Moines ("Mercy"), where he would remain inpatient until March 21, 2019.

74. There, diagnostic studies revealed, among others, the following injuries:

- A comminuted fracture of the radial shaft;

- Innumerable adjacent bullet fragments within the soft tissues of the mid forearm; and

- Overlying soft tissue wound with soft tissue gas and swelling throughout the proximal to mid forearm.

75. Dr. Kamaldeen Aderibigbe performed surgery on Regenold on March 20, 2019.

76. Dr. Aderibigbe's preoperative and postoperative diagnoses were: (1) open fracture of the right radial shaft; and (2) comminuted radial shaft fracture.

77. The surgery was described as an open reduction and internal fixation of a comminuted right radial shaft fracture.

78. Regenold's injuries were extensive and the surgery was complex. This portion of the operative note describes the same:

```
JUSTIFICATION FOR MODIFIER 22:
Patient sustained a highly comminuted radial shaft fracture.  Due to the
nature of the ballistic, there was significant comminution.  Significant
amount of time was spent placing multiple interfragmentary screws to obtain
alignment, rotation and length of the radius.  All this increased surgical
time in excess of 50% more than what would be required for routine fixation of
a radial shaft fracture.
```

79.     After his release from Mercy, Regenold continued to have major difficulties with pain, numbness, and limitations associated with the gunshot-wound injury.

80.     Regenold reported continuing symptoms to Dr. Aderibigbe at a May 10, 2019 follow-up appointment.  Dr. Aderibigbe's clinical examination showed evidence consistent with an ulnar nerve injury.

81.     A nerve conduction study and EMG were performed at Iowa Ortho on August 16, 2019.  The nerve conduction study was abnormal.  It revealed right median neuropathy, localizing to the level of the wrist.

82.     Regenold continues to suffer the effects of the gunshot wound and consequent neuropathy.

83.     In addition to his physical injuries, Regenold has endured psychological trauma associated with being shot by Higgins.

84.     He was diagnosed with Post-Traumatic Stress Disorder in relation to the shooting of March 19, 2019.

<u>The attempted post-hoc justifications</u>

85.     Regenold accepted the consequences of his illegal conduct.  He pled guilty to third-degree burglary.  But thus far neither the City of Ankeny nor Higgins have done the same.  And like Higgins, the City chose to lie in order to justify the objectively unreasonable shooting.

86.     Indeed, the City, through its Police Chief Darius Potts, published false statements about the incident in an attempt to justify Higgins's unreasonable use of deadly force.

87. Chief Potts stated that Regenold was given commands to comply and did not comply.

88. This was untrue. Regenold did not disobey any commands.

89. Chief Potts also stated that Regenold advanced on officers, thereby indicating that Regenold had committed assault on a law-enforcement officer.

90. Once again, this was untrue. Regenold did not advance on officers, did not assault anyone, and was never charged with doing so.

91. Chief Potts was also quoted as stating, "When officers don't know whether a suspect is armed, suspicious hand and body movements can prompt officers to act, which includes firing their weapons."

92. This statement was false and misleading for numerous reasons.

93. There were no reports that the person inside the Auto Spa on March 19, 2019 was armed. No one, including Higgins, observed or reported that Regenold held or possessed a weapon, nor was he ever charged with doing so. Notably, Regenold was charged only with third-degree burglary, even though possessing a weapon while committing a burglary would have been chargeable as second-degree burglary under Iowa law.

94. Moreover, Regenold did not engage in any "suspicious hand and body movements," instead immediately putting his empty hands up when he knew he had been caught. Higgins shot him anyway.

95. The Ankeny Police Department also made false statements regarding the shooting while Regenold was at Mercy.

96. Mercy records indicate that an officer who accompanied Regenold to the hospital told Mercy staff that Regenold had "charged" at police.

97. This, too, was false. At no point did Regenold charge at any police officer on March 19, 2019, and he was never accused of any crime for having done so.

### Clearly established law

98. Higgins intentionally used deadly force on Regenold by firing his service weapon twice, with one of the two bullets striking Regenold in the right arm. The other bullet missed.

99. Clearly established constitutional precedent required that Higgins's use of force on Regenold on March 19, 2019, be "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

100. *Graham* and its Fourth Amendment progeny render Higgins's subjective beliefs and intentions irrelevant, because the test examines what an objectively reasonable officer would do under the circumstances. *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000).

101. Clearly established constitutional precedent prohibited Higgins from using deadly force against Regenold on March 19, 2019, unless Regenold posed an immediate threat of death or serious physical injury to Higgins or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

102. Clearly established constitutional precedent required Higgins to provide a warning, if feasible, before subjecting Regenold to deadly force. *Tennessee v. Garner*, 417 U.S. 1, 11-12 (1985).

103. No reasonable officer could have considered Regenold to be a fleeing suspect on March 19, 2019.

104. No reasonable officer could have considered Regenold to have committed a violent felony involving the infliction of serious physical injury or death.

105. Regenold never resisted arrest or attempted to evade arrest by flight.

106. Regenold did not pose an immediate threat of death or serious physical injury to officers or others.

107. Regenold voluntarily surrendered himself to law enforcement on March 19, 2019. Higgins responded by shooting him in the arm, thereby violating Regenold's constitutional rights.

108. Higgins's misconduct was the direct cause of serious, ongoing injuries to Regenold.

<u>42 U.S.C. § 1983 Fourth and Fourteenth Amendment violations</u>

109. An objectively reasonable officer at the scene on March 19, 2019 would have known that (1) deadly force was not justified on Regenold, who was unarmed with his arms up in a surrender position and his hands empty and having never "advanced" or "charged" at officers, and (2) such an extreme use of force should never have been contemplated given the totality of the circumstances, including the fact that Higgins never identified himself as a police officer before firing two shots immediately upon entering the building and an instant after shouting unintelligibly.

110. Higgins acted unreasonably on March 19, 2019, by failing to render a warning regarding the use of deadly force on an unarmed male subject, Regenold.

111. Higgins acted unreasonably by firing twice at Regenold an instant after shouting something unintelligible.

112. By the actions described above, Higgins, under color of state law, deprived Regenold of his clearly established right to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

113. Higgins subjected Regenold to this deprivation either maliciously or with reckless disregard for whether his rights would be violated.

114. As a direct and proximate result of the acts and omissions of Higgins, Regenold suffered severe and permanent injuries, was forced to endure great pain and mental suffering, and was thereby damaged in an amount to be determined by a jury.

115. Punitive damages, in an amount to be determined by a jury, are available against Higgins and are claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983).

116. Regenold is entitled to recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

<u>Prayer for relief</u>

WHEREFORE, Plaintiff Myles Regenold prays for judgment against Defendant Tony Higgins as follows:

1. That this Court find that Defendant Tony Higgins committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2. A money judgment against Defendant Higgins for compensatory and punitive damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and pre-judgment interest;

3. For an order mandating discipline for the use of such excessive force executed by Defendant Higgins on March 19, 2019; and

4. For such other and further relief as this Court deems just and equitable.

Dated this 2nd day of March, 20201             Respectfully submitted,


_____

Thomas P. Tully   AT0011150
Christopher Johnston   AT0012625
The Law Group of Iowa
 *A Johnston Martineau LLP*
*Company*
7900 Hickman Road, Suite 200
Windsor Heights, IA 50324
Phone: (515) 493-4878
Fax:    (515) 414-7782
Email: Tully@JMLegal.com
Email: CJohnston@JMLegal.com

**ATTORNEYS FOR PLAINTIFF**

91288741.1